**Leopoldo NARVAIZ, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 70810.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 23, 1992.

---

William T. Reece, Jr. (on appeal only), San Antonio, for appellant.

Steven C. Hilbig, Dist. Atty., Fred G. Rodriguez, Former Dist. Atty., and Elizabeth Taylor and Daniel Thornberry, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

After a trial held in November 1988, a Bexar County jury found twenty-year-old Leopoldo Narvaiz, Jr. (appellant) guilty of the April 15, 1988, capital slaying of one male, eleven-year-old E___ M___, Jr., and three females, fifteen-year-old M___ M___, seventeen-year-old S___ M___, and nineteen-year-old J___ M___.[1] At the punishment phase of the trial, the jury answered affirmatively the punishment issues submitted to them under Article 37.071(b) of the Texas Code of Criminal Procedure,[2] and appellant was sentenced to death. Direct

---

**1.** Texas Penal Code § 19.03(a)(6)(A), the statute under which appellant was convicted, provides that "[a] person commits [a capital] offense if he commits murder [by intentionally or knowingly causing the death of an individual] and the person murders more than one person during the same criminal transaction."

**2.** At the time of appellant's trial, Article 37.071 provided in relevant part:

(b) On conclusion of the presentation of the evidence [at the punishment phase], the court shall submit the following three issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

(c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted.

\* \* \* \* \*

(f) If the defendant is convicted of an offense under Section 19.03(a)(6), Penal Code, the court shall submit the three issues under Subsection (b) of this article only with regard to the conduct of the defendant in murdering the deceased individual first named in the indictment.

The record reflects that only issues (b)(1) and (b)(2) were submitted to the jury at appellant's trial, and they were submitted only with respect to appellant's conduct in murdering E___ M___, Jr., who was the first victim named in appellant's indictment.

appeal to this Court was then automatic under Article 37.071(h).[3] We will affirm.

In twenty points of error, appellant challenges: the sufficiency of the evidence to support the jury's finding of guilt beyond a reasonable doubt; the sufficiency of the evidence to support the jury's affirmative answers to the punishment issues; the trial court's excusal of six venirepersons from jury service; the trial court's denial of appellant's motion for change of venue; the trial court's admission in evidence of photographs of the crime scene, certain hearsay testimony, evidence of uncharged misconduct, a copy of a written statement appellant gave to police after his arrest, and a tape recording of victim S___ M___'s "911" telephone call to the police; the validity, under the Texas and United States Constitutions, of the Penal Code provision under which he was found guilty and the Code of Criminal Procedure provision under which his punishment was assessed; the trial court's failure to charge the jury on voluntary manslaughter with respect to all his victims; and the adequacy, under the United States Constitution, of his counsel's assistance at both the guilt/innocence and punishment phases of trial. With the exception of the points of error challenging the sufficiency of the evidence, appellant's points will be addressed in the order in which they occurred at trial.

■ In point of error fifteen, appellant argues he has been denied his liberty without due process of law because the evidence adduced at trial was insufficient to support the jury's finding of guilt. Appel-

lant argues that "the physical, medical and other forensic [evidence] has not disproven" an "outstanding reasonable hypothesis" that he is guilty only of voluntary manslaughter[4] arising out of legally adequate provocation by victim J___ M___.

Appellant was charged with, and found guilty of, violating Penal Code § 19.-03(a)(6)(A). See footnote one, supra. The State presented forty-eight witnesses[5] and numerous exhibits at the guilt/innocence phase in an attempt to prove its case. Appellant presented no evidence at the guilt/innocence phase. Viewed in the light most favorable to the jury's verdict, the State's evidence established the following:

Appellant was S___ M___'s boyfriend "on and off" for several years before the two split up, at S___ M___'s insistence, in early February 1988. Late on the evening of March 27, 1988, appellant went to S___ M___'s residence at 202 Formosa Street in San Antonio and found her sitting with her new boyfriend, Ricky Moore, in Moore's pickup truck. Appellant demanded to speak with S___ M___, but she refused. When appellant became belligerent, S___ M___ and Moore drove away, but they returned a while later and continued their conversation beside the pickup. Sometime after midnight, appellant, who had previously left, also returned, carrying a knife and a pipe. S___ M___ and Moore retreated into the residence and telephoned the police. Through a window, Moore observed appellant smashing the windows out of Moore's pickup. S___ M___'s mother,

---

**3.** Unless otherwise indicated, all references to articles are to those in the Texas Code of Criminal Procedure.

**4.** Texas Penal Code § 19.04 provides in relevant part:

(a) A person commits [voluntary manslaughter] if he causes the death of an individual under circumstances that would constitute murder under ... this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another person acting with the person killed which passion arises at

the time of the offense and is not solely the result of former provocation.

(c) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

(d) An offense under this section is a felony of the second degree.

**5.** Among the prosecution witnesses were numerous police officials, two forensic serologists, two Bexar County medical examiners, an electronic signal processing analyst from the Federal Bureau of Investigation, a bloodstain pattern analyst, a fingerprint analyst, two relatives of the victims, and several friends of the victims and appellant.

who had been inside the residence, went outside, confronted appellant, and "asked him why he kept coming around and bothering [S___ M___] when she didn't want nothing [sic] to do with him." Appellant told her that "if he wasn't going to be able to have [S___ M___], nobody else was going to." Appellant left before the police arrived.

A few nights later, appellant "broke into" S___ M___'s residence on Formosa Street. The day after the break-in, S___ M___ and her family (i.e., her mother and three siblings, M___ M___, J___ M___, and E___ M___, Jr.) moved to a mobile home located on lot 277, Villa Grande mobile home park, 8622 South Zarzamora Street in San Antonio.

On the evening of April 14, 1988, appellant, wearing white tennis shoes, attended a party at a residence at 347 East Amber Street, about two miles from S___ M___'s new residence on South Zarzamora Street. Appellant left the party sometime during the early morning hours of April 15.

At 3:17 a.m., April 15, 1988, San Antonio police received an emergency "911" telephone call, which was tape-recorded. The caller, later identified as S___ M___, first told the "911" operator, "My boyfriend just beat us up. He's killed my little sister." She then gave her address as "277 Villa Grande Drive." There was screaming in the background. Moments later, a second voice on the line, later identified as that of appellant, asked S___ M___, "Why did you have to do this to me?" S___ M___ responded, "I love you. I love you. I am dying already. I can't breathe." Finally, before the line went dead, appellant asked S___ M___, "Did you call the cops?"

The "911" operator established quickly that there was no street known as "Villa Grande Drive" in San Antonio. She then deduced that the caller had been referring to the Villa Grande mobile home park on South Zarzamora Street. Several San Antonio police officers were then dispatched to that location, arriving at approximately 3:30 a.m. Upon locating S___ M___'s residence, they found it quiet and dark, with a single window propped open with a piece of wood. A large ice chest was positioned beneath that window. The officers also found the back door of the home ajar.

The officers entered the mobile home and found S___ M___, M___ M___, J___ M___, and E___ M___, Jr. all stabbed to death. No one else was found in the residence. Autopsies of the victims showed later that S___ M___'s body had sustained six knife wounds, M___ M___'s body nine, J___ M___'s body 23, and E___ M___ Jr.'s body 63. The pattern of the victims' wounds indicated that each had struggled with their assailant before succumbing. Also, a later study of the crime scene by a bloodstain pattern analyst indicated that there had probably been only one assailant.

The police also found several kitchen knives scattered throughout the residence, and two such knives were found in the yard of the residence a few feet from the back door that had been found ajar. One of the knives found in the yard contained a thumbprint matching that of appellant's left thumb.

At 6:30 a.m., the victims' father, E___ M___, Sr., arrived at the mobile home park and, in a rage, blamed the police for the deaths. "This is your fault," he said to them. "I told you Leo would do this." S___ M___ had no boyfriend named "Leo" except for appellant.

Later that same morning, appellant, wearing only gym shorts, was arrested inside the residence at 347 East Amber Street, the site of the party he had attended the night before. At the time of the arrest, appellant had a deep cut on the front of his right thigh, a lesser cut on his left hand, and "scratches all on his upper torso, sides, chest, [and] arms." A search of the East Amber residence conducted at the time of the arrest turned up a pair of wet blue jeans hanging on a towel rack in the bathroom and a pair of damp, white tennis shoes in a room next to the bathroom. There was a cut on the jeans that corresponded to the size and location of appellant's leg wound, and the tennis shoes were similar to the pair worn by appellant at the party the night before. Furthermore, a later chemical analysis of the jeans

and shoes revealed that each contained significant traces of human blood.

The jury also had before it a signed, written statement that appellant gave to police two days after his arrest. The statement read as follows:

I am going to give this statement voluntarily and I have not been threatened or promised anything to give this statement. I want to cooperate with the police on my own. I can read and write English. I went up to the ninth grade in school.

I was going on six years with my girlfriend [S___ M___]. I met [S___ M___] through her sister [J___ M___] at school. [S___ M___] was thirteen years old and I was sixteen years old when we started going with each other. I think I was fifteen instead of sixteen. During our relationship we loved each other and we even talked about marrying each other several times. We broke up about three weeks ago. I went to her house on Formosa to pick up my clothes and she was outside with somebody else. They were in a pickup truck. I got mad and asked [S___ M___] what she was doing with him and who he was. She wouldn't say anything. The guy put the truck in reverse and almost ran over me. They drove away in the truck and I waited near the house and when they got back she got off the truck and went inside. The guy got off the truck and I started telling him that he was way too much older than her. The guy told me not to worry about it. Then I got mad and broke all of the truck windows. After my break up with [S___ M___] I started using cocaine. I didn't use very much, but I used it. I was losing my sleep and my weight. I was using a quarter of a gram of cocaine. I had a job, but I couldn't concentrate on anything. I wouldn't eat at work because I was always thinking about [S___ M___].

[S___ M___'s] phone number at home was changed and I couldn't call her. She would call me at home late at night. She wouldn't say anything on the phone but I knew it was her because when I asked her questions she would push a phone button once for no and twice for yes. I knew it was her because nobody would call late at night but her. When I would ask her if she still loved me she would press once for no.

On Thursday, 04-14-88, I got off work at 4:30 p.m. I ate a little bit of supper and then I went with Richard Ramos and his brother, Roland, and Richard got his hair cut. They brought me home because they had to take their mother's car back. When my mom came home I asked her for her car and she let me have it. I went and picked up Richard and we came back to my house and played pool for about an hour.

Then me and Richard walked to Leslie's house. When we got there we went to the store and bought some beer. We came back to Leslie's house and just talked, listened to the radio and drank some beer. I was drinking and smoking marihuana when a song came on the radio. It was mine and [S___ M___'s] song. The name of it is "Woman." I started getting real depressed. I started doing some cocaine. I snorted it. I did about a half a gram of cocaine. About 1:00 or 1:00 a.m. I went and sat outside for awhile by myself. Leslie is a friend of mine. His full name is Leslie Broich. His house is at 347 E. Amber. His brother Jim Broich and a guy named Alfred live there too. The people that were there were Leslie, Jim, Richard, Alfred, David DeLaFuente, a guy I know as Cano, and a guy that I only know as Amador.

As I was sitting there a couple of guys in a black Chevy pickup truck came by. I know the driver only as Joe. I owed Joe $700.00 for a pound of marihuana. I left with Joe and a friend of his. I didn't know his friend. We went to the Fajita Junction on Pleasanton Rd. When Joe and his friend got off the truck behind the Fajita Junction to use the bathroom I did two grams of cocaine in the truck. They didn't know that I did the coke, but I'm sure they found it missing by now. Then Joe drove me near [S___ M___'s] trailer house and dropped me off. Then

they drove away. I jumped the fence and walked up to the front door and knocked. [S— M—] opened the door and then told me to go around the back. When I went to the back door [S— M—] let me in. I was spaced out on the cocaine that I had done. I was talking to [S— M—] in the kitchen when her sister [J— M—] came over there and saw me. [J— M—] got mad and told me to leave. [S— M—] told her that she wanted to talk to me. *[J— M—] got a knife and stabbed me in the leg. She tried to stab me again and I tried to stop her when she stabbed my hand. Then I just lost it. I remember taking the knife from [J— M—] and stabbing her. I just went crazy. I remember that [M— M—] was there and she was screaming, but I don't remember stabbing her. I remember their brother, [E— M—, Jr.,] being there but I don't remember stabbing him either. It all happened real fast and I was real spaced out. I do remember getting some knives from the kitchen counter or someplace in the kitchen. I remember seeing [S— M—] standing there and she was bleeding. I remember [S— M—] saying that she couldn't breathe. I remember holding [S— M—] as she was standing up and then I layed her down on the bed. Then I stayed next to [S— M—] and cried for about twenty minutes. I could hear somebody still yelling in the other room. Then I remember walking out the same door that I came in. I stayed outside crying for a couple more minutes. Before I left I do remember that [S— M—] was dead.* I was still spaced out and I went over the fence. I walked to Leslie's house. I went straight there. When I got there only Richard was awake. I knocked on the back door and Richard opened it. When I went in Richard asked me what happened. I couldn't talk very good. I would only say about four sentences at a time. Richard kept telling me to calm down. I tried to tell him something, but I couldn't. I told Richard that I had

been stabbed. I don't remember all that I told Richard.

I remember Alfred getting up in the morning and Richard asked him to go get some cigarettes. They brought me some juice back.

I feel bad about this and it would never happen again. I would just like to say that when I went to [S— M—'s] the cocaine really controlled me. This is all that I remember that happened. I have read this statement and it is true and correct the way it happened.

(Emphasis added.)

The due process clause of the Fourteenth Amendment to the United States Constitution requires that every state criminal conviction be supported by evidence that a rational factfinder could accept as sufficient to prove all the elements of the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *Coit v. State*, 808 S.W.2d 473, 475 (Tex.Cr.App.1991). Section 2.01 of the Penal Code contains the same requirement. As an appellate court reviewing a cold record long after the jury has evaluated the evidence and made its finding, our task is to consider all the record evidence, direct and circumstantial, in the light most favorable to the jury's verdict, and to determine whether, based on that evidence, any rational jury could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154, 158–159 (Tex.Cr. App.1991). If, based on all the evidence, a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt, due process requires that we reverse and order a judgment of acquittal. Appellate judges are not factfinders, however; we may not re-evaluate the weight and credibility of the record evidence. Rather, we act only "as a final, due process safeguard ensuring ... the rationality of the factfinder." *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988).

■ Utilizing the required standard of review, we must reject appellant's suffi-

ciency argument. First, the only evidence suggesting voluntary manslaughter as to any of the four victims was the claim in appellant's written statement that J___ M___ stabbed him first, and, given the other evidence at trial, the jury was certainly entitled to disbelieve that claim. Second, even if the jury believed that portion of appellant's written statement, it's finding of guilt could well have been based on the evidence of the other three killings.

Viewed in the light most favorable to the jury's verdict, the record evidence was plainly sufficient to support the jury's finding of guilt of capital murder beyond a reasonable doubt. The State's case was quite strong, especially in light of appellant's written statement, which corroborated much of the State's other evidence and implicated appellant alone in all four murders. Point of error fifteen is overruled.

■ Appellant contends in point of error eighteen that the evidence at his trial was insufficient to support the jury's affirmative answer to the first punishment issue. See footnote two, supra. Appellant argues that "the evidence shows that the entire incident took place in a very brief period of time, and it stretches the imagination to think that a rational trier of fact could have found beyond a reasonable doubt that [he] acted deliberately."

■ Under our Code of Criminal Procedure, the burden was on the State to prove the punishment issues beyond a reasonable doubt. See footnote two, supra. To prove that appellant's conduct that caused E___ M___, Jr.'s death was done "deliberately," the State was obligated to prove that appellant's conduct arose from a conscious decision, after at least brief consideration, to cause E___ M___, Jr.'s death. *Farris v. State*, 819 S.W.2d 490, 497 (Tex.Cr.App.1990); *Fearance v. State*, 620 S.W.2d 577, 584 (Tex.Cr.App.1981).

In reaching its finding on the first punishment issue, the jury was entitled to consider all the evidence submitted at the

guilt/innocence and punishment phases of trial. *Harris v. State*, 790 S.W.2d 568, 577 (Tex.Cr.App.1989); *Green v. State*, 682 S.W.2d 271, 287 (Tex.Cr.App.1984).[6] As an appellate court reviewing the jury's finding, our task is to view all the evidence that was before the jury in the light most favorable to the jury's finding, and then to determine whether, based on such evidence, any rational jury could have found beyond a reasonable doubt that appellant's conduct that caused E___ M___, Jr.'s death arose from a conscious decision, after at least brief consideration, to kill. *Farris v. State*, 819 S.W.2d at 497.

Viewed in the necessary light, the evidence at appellant's trial established, among other things, that he stabbed E___ M___, Jr. 63 times. That evidence alone reasonably supported a "yes" answer to the first punishment issue. *Fearance v. State*, 620 S.W.2d at 584; *Granviel v. State*, 552 S.W.2d 107, 123 (Tex.Cr.App. 1976). Point of error eighteen is overruled.

■ In his nineteenth point of error, appellant maintains the record evidence was insufficient to support the jury's affirmative answer to the second punishment issue. See footnote two, supra. Appellant complains that the State's evidence at the punishment phase showed "nothing more than previous, comparatively minor extraneous offenses allegedly committed by [him and] the fact that [he] used and sold [illegal] drugs." Appellant complains further that "[t]here was no psychiatric testimony ... showing that [he] was likely to be dangerous in the future."

As noted previously, under our Code of Criminal Procedure, the burden was on the State to prove the punishment issues beyond a reasonable doubt. Thus, the burden was on the State to prove that "there is a probability that [appellant] would commit criminal acts of violence" in the future, so as to constitute a continuing threat, whether in or out of prison. *Smith v. State*, 779 S.W.2d 417, 421 (Tex.Cr.App. 1989); *Rougeau v. State*, 738 S.W.2d 651,

---

**6.** No evidence pertinent to punishment issue one was offered at the punishment phase of trial.

660 (Tex.Cr.App.1987). In its determination of the issue, the jury was entitled to consider all the evidence presented at both the guilt/innocence and punishment phases of trial. *Valdez v. State,* 776 S.W.2d 162, 166–167 (Tex.Cr.App.1989). As an appellate court reviewing the jury's finding, we must view all the evidence before the jury in the light most favorable to its finding, and then determine whether, based on that evidence, any rational jury could have found, beyond a reasonable doubt, that the answer to the second punishment issue was "yes." *Harris v. State,* 738 S.W.2d 207, 225–226 (Tex.Cr.App.1986).

Viewed in the necessary light, the evidence at the punishment phase established that appellant sold marihuana, cocaine, and amphetamines to others, young and old, in the neighborhood where he lived; that he often ingested such illegal drugs himself and sometimes became violent when he did so; that he "would constantly steal from ... people ... so he could buy drugs"; that on one occasion a neighbor saw him "in the driveway [of his residence] beating up on [S___ M___], slapping her around" and "dragg[ing] her ... by her hair"; that he once threatened a neighborhood youth with a knife; and that his reputation for being peaceable and law-abiding was bad. Furthermore, the evidence at the guilt/innocence phase established that appellant habitually used marihuana and cocaine, that he sometimes exhibited threatening and violent behavior toward people and property, and that the crime of which he was found guilty was, to say the least, extreme.

Two terms ago we noted that "[s]hocking circumstances of the offense itself, ..., habitual use of illegal drugs, [and] prior

unadjudicated acts of violence against people and property have all been held by this Court to constitute evidence of future dangerousness." *Farris v. State,* 819 S.W.2d at 498. Considering the record evidence as a whole, we conclude that it was sufficient to support the jury's affirmative answer to the second punishment issue. Contrary to appellant's assertion, it was not essential for the State to buttress its case on future dangerousness with psychiatric testimony. *Huffman v. State,* 746 S.W.2d 212, 224 (Tex.Cr.App.1988). Point of error nineteen is overruled.

■ In point of error number one, appellant argues the trial court abused its discretion in granting the State's challenge for cause of venireman Neftali Garcia. Appellant contends that "[a] careful reading of the entire [voir dire] examination of this venireman suggests that he merely did not want to serve." The State counterargues that the trial court properly excused Garcia under Article 35.03, § 1.

Venireperson Garcia testified during voir dire that he was then a candidate for a Texas Senate seat and was, in fact, in the midst of his campaign for office. He testified further that "with the situation as it is, with the campaign, [his] concentration would be diluted"; that he "could not listen [satisfactorily during the trial] and be fair to both parties"; and that he could not, therefore, honestly take the juror's oath, as required by Article 35.22.[7] The State, citing Article 35.16(b)(3)[8] and *Nichols v. State,* 754 S.W.2d 185 (Tex.Cr.App.1988),[9] challenged Garcia for cause. The trial court granted the State's challenge over appellant's objection.

---

**7.** Article 35.22 provides:

> When the jury has been selected, the following oath shall be administered them by the court or under its direction: "You and each of you do solemnly swear that in the case of the State of Texas against the defendant, you will a true verdict render according to the law and the evidence, so help you God."

**8.** Article 35.16(b)(3) provides that the State may challenge a prospective juror for cause if "he has a bias or prejudice against any phase of the

law upon which the State is entitled to rely for conviction or punishment."

**9.** In *Nichols,* we held that a venireperson who "was so preoccupied with personal problems that he was unfit to serve" was properly subject to a "non-enumerated" challenge for cause under Article 35.16. We later held that such venirepersons are not subject to challenges for cause, but that they may still be excused from jury service under Article 35.03, § 1. *Butler v. State,* 830 S.W.2d 125 (Tex.Cr.App.1992).

Article 35.03, § 1, provides that "the [trial] court shall ... hear and determine excuses offered for not serving as a juror, and if the court deems the excuse sufficient, the court shall discharge the juror or postpone the juror's service to a date specified by the court." Under this Code provision, "the power to grant an excusal from jury service ... inheres to the trial judge from the first assemblage of the array until the juror is, at last, seated." *Butler v. State*, 830 S.W.2d 125, 131 (Tex.Cr.App. 1992). And, "[a]s the legislature has placed this responsibility and discretion upon the trial judges of this state," their decisions as to the sufficiency of excuses shall not be overturned absent an abuse of discretion. *Johnson v. State*, 773 S.W.2d 322, 330 (Tex.Cr.App.1989).

The trial court here clearly had the authority, under Article 35.03, § 1, to "hear and determine" the excuse Garcia offered for not serving as a juror; thus, it was of no consequence if, as seems likely, the trial court thought it was acting under the authority of Article 35.16. Moreover, the trial court's decision to excuse Garcia was reasonable under the circumstances presented to the court; thus, there was no abuse of discretion. Compare *Butler v. State*, 830 S.W.2d 125; *Johnson v. State*, 773 S.W.2d 322. Given our disposition of this point, we need not consider whether Garcia was also subject to challenge for cause under Article 35.16(b)(3). Point of error one is overruled.

■ In point of error two, appellant contends the trial court abused its discretion in granting the State's challenge for cause of venireperson Delia Vela. The record reflects that the State challenged Vela under Article 35.16(b)(3) [10] after she gave contradictory positive *and* negative answers—depending on who asked the question—when asked whether she could ever convict on the basis of circumstantial evidence alone. Appellant argues that Vela was not challengeable for cause on that ground because she was successfully "rehabilitated" by defense counsel. The State counterargues that Vela was a classic "vacillat-

ing" venireperson and that the trial court acted reasonably in granting the State's challenge.

■ Because circumstantial evidence is no less trustworthy than direct evidence, a defendant's guilt, even of capital murder, may properly be proven by circumstantial evidence alone. Thus, a venireperson who indicates that she would be unable to convict based only on circumstantial evidence is properly challengeable for cause under Article 35.16(b)(3). *Caldwell v. State*, 818 S.W.2d 790, 797 (Tex.Cr.App.1991). Furthermore, "[since] the trial judge has the opportunity to view the venireman's demeanor with all that that encompasses, [this Court is] bound to affirm the trial court's excusal of a prospective juror if there is any adequate basis in the record to support the trial court's decision." *Montoya v. State*, 810 S.W.2d 160, 167 (Tex.Cr.App.1989). Here, there is a basis in the record adequate to support the trial court's decision; thus, we discern no abuse of discretion. Point of error two is overruled.

Appellant argues under his third and fourth points of error that the trial court abused its discretion in granting the State's challenge for cause of venirepersons Thomas Lightfoot and Guadalupe Moreno, respectively. The record reflects that the State challenged Lightfoot and Moreno for cause under Article 35.16(b)(3) after they each gave contradictory positive *and* negative answers when asked whether they would require proof beyond all doubt before they could convict. Appellant argues that Lightfoot was not challengeable for cause under Article 35.16(b)(3) because the record shows he "merely wanted to make certain that the State had proven the case to his satisfaction, to wit beyond a reasonable doubt, which was by his definition one hundred percent in his mind." Appellant argues that Moreno was not challengeable because she was successfully rehabilitated by defense counsel. The State responds that Lightfoot and Moreno were both vacillating venirepersons and that the record supports the trial court's decision.

**10.** *See footnote eight, supra.*

Under our law, the State, in order to obtain a conviction, must prove an accused's guilt beyond a reasonable doubt, not beyond all doubt. Thus, a venireperson who would hold the State to a burden of proof higher than beyond a reasonable doubt is challengeable under Article 35.-16(b)(3). *Jacobs v. State*, 787 S.W.2d 397, 404 (Tex.Cr.App.1990). Here, the record shows that venirepersons Lightfoot and Moreno each gave contradictory answers when questioned about the level of proof they would require for a finding of guilt. Since the record, therefore, adequately supports the trial court's implied findings that Lightfoot and Moreno could not follow the law regarding burden of proof, we discern no abuse of discretion. Points of error three and four are overruled.

In his fifth point of error, appellant argues the trial court abused its discretion in granting the State's challenge for cause of venireperson Emilia Luna. The record reflects that the State challenged Luna under Article 35.16(b)(3) after she stated unequivocally that she could never consider recommending probation for someone found guilty of murder, which is a lesser included offense of capital murder. See Articles 37.08 and 37.09. Appellant complains also that "the [trial] court should have allowed the defense to conduct further voir dire on this [challenge] rather than granting the State's challenge for cause without even allowing the defense to ask questions [on this matter]." The State counterargues that the voir dire record supports the trial court's ruling, and that appellant made no request to the trial court to question Luna further on the subject of probation.

Again, we see no abuse of discretion. A venireperson is properly challengeable for cause under Article 35.-16(b)(3) if she cannot consider the full range of punishment, including probation, for any offense of which the accused may be found guilty. *Nethery v. State*, 692 S.W.2d 686, 691 (Tex.Cr.App.1985). Under Article 42.12, § 4, a jury may recommend probation for one convicted of murder. Thus, venireperson Luna was properly

challengeable for cause because she stated she could never consider recommending probation for the lesser included offense of murder. *Williams v. State*, 773 S.W.2d 525, 536 (Tex.Cr.App.1988). As for appellant's complaint that he was not given an opportunity to "rehabilitate" venireperson Luna on this issue, we note that, as the State points out, appellant never even asked to question Luna further on the subject of probation. Absent a request for further questioning, we cannot say that the trial court abused its discretion. Compare *Perillo v. State*, 656 S.W.2d 78, 81–82 (Tex.Cr.App.1983). Point of error five is overruled.

Appellant argues in point of error six that the trial court abused its discretion in denying his challenge for cause of venireperson Mark Wells. The State responds that appellant has shown no harm because he has not identified an objectionable juror he was forced to accept because of the trial court's action.

Before an appellant can obtain a reversal based on the trial court's erroneous denial of his valid challenge for cause, the appellant must show that he was in some sense harmed by the trial court's action. " 'The harm may be shown in the denial of [the] challenge for cause by showing exhaustion of the defendant's peremptory challenges, denial of a request for additional peremptory challenges, and the seating of a juror upon whom the defendant would have exercised [a] peremptory challenge.' " *Harris v. State*, 790 S.W.2d at 581 (quoting *Payton v. State*, 572 S.W.2d 677, 680 (Tex.Cr.App.1978)). Here, the record reveals that Wells did not sit on the jury. And appellant has not pointed to any juror who did sit that was objectionable to him. Thus, assuming *arguendo* that the trial court erred in denying appellant's challenge for cause, we fail to see how appellant was harmed in any way. Point of error six is overruled.

Appellant maintains in his seventh point of error that the trial court abused its discretion—and violated his Fourteenth Amendment right to due process of law—when it denied his motion for change of

venue. The motion and accompanying affidavits, filed pursuant to Article 31.03, alleged generally that appellant could not get a fair trial in Bexar County because of prejudicial publicity. In his brief, appellant, again without citing any particular portion of the voir dire or any particular piece of evidence admitted at the venue hearing, argues the record "establishes that the publicity in this ... case was pervasive, prejudicial, and inflammatory." The State responds that the trial court's decision was reasonable given the record before it.

At the venue hearing, appellant offered, and the trial court admitted in evidence, several articles concerning appellant and the offense in question that appeared in the San Antonio Light newspaper during the five-month period between appellant's arrest and trial. The record on appeal does not reflect, however, the precise number of articles, their dates of publication, their contents, or the readership of the San Antonio Light. Nor was there any evidence offered concerning publicity in Bexar County on radio, television, or print media other than the San Antonio Light.

 For an accused to receive a fair trial consistent with due process of law, the jury must determine his guilt or innocence on the basis of the evidence admitted at trial and not on the basis of other facts or allegations appearing in the media. Sometimes, however, situations arise in which pretrial publicity is so pervasive and prejudicial as to create a reasonable probability that an impartial jury cannot be empaneled even with the most careful voir dire. In such situations, a change of venue is compelled by the Fourteenth Amendment's due process clause. *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

 Merely because a case has been publicized in the media does not automatically give rise to a presumption of prejudice so as to necessitate a change of venue;

due process does not require that jurors be completely ignorant of the facts of the case. *Ransom v. State,* 789 S.W.2d 572, 579 (Tex.Cr.App.1989). Rather, a defendant seeking a change of venue on publicity grounds "bears a heavy burden to prove the existence of such prejudice in the community that the likelihood of obtaining a fair and impartial jury is doubtful." *Nethery v. State,* 692 S.W.2d at 694. An appellate court reviewing a trial court's decision on this matter may reverse only for an abuse of discretion. *DeBlanc v. State,* 799 S.W.2d 701, 705 (Tex.Cr.App.1990). In other words, the trial court's decision will not be disturbed so long as it is within the realm of reasonableness given the record that was before the trial court.

Appellant has shown us nothing in the record that demonstrates that the trial court's denial of his venue motion was outside the realm of reasonableness. Thus, we see no abuse of discretion. Point of error seven is overruled.

In point of error ten, appellant complains of the admission in evidence, at the guilt/innocence phase, of State's exhibits 25, 26, 29P, 30P, 32P, 33P, 34P, 36, 37, 40, 68, 71, 72, and 73, all photographs of the victims' bodies exactly as they were found at the crime scene. Appellant argues that the photographs were inadmissible under Rule 403 of the Texas Rules of Criminal Evidence [11] because their "inflammatory and prejudicial nature ... highly outweighed any relevance." Appellant makes no attempt to explain why the photographs were "inflammatory and prejudicial" except to note that they were "duplicative," "gruesome," and "bloody."

With respect to the photographs other than State's exhibits 25 and 26, the State argues appellant's point of error should be dismissed as inadequately briefed because he has failed to cite any place in the record where his argument was made and ruled upon in the trial court. With respect to State's exhibits 25 and 26, the State con-

---

**11.** Rule 403 provides:
　　Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

tends that their probative value was not substantially outweighed by the danger of unfair prejudice.

A careful reading of appellant's brief reveals that with respect to all the photographs except State's exhibits 25 and 26, he has failed, as the State points out, to cite any place in the record where his Rule 403 argument was made to the trial court or where a ruling was obtained on such argument. Because the right to appellate review in this state extends only to complaints made in accordance with our published rules of appellate procedure—which require an appellant to specify the pages in the record where the alleged error can be found—we hold that with respect to State's exhibits 29P, 30P, 32P, 33P, 34P, 36, 37, 40, 68, 71, 72, and 73, appellant's complaint is inadequately briefed and not preserved for our review. Tex.R.App.Proc. 74 and 210; *Harris v. State*, 827 S.W.2d 949, 958 (Tex. Cr.App.1992).

Turning now to a consideration of the trial court's admission of State's exhibits 25 and 26, we note initially that the photographs in question are approximately eight inches by ten inches in size, and that they show the body of M___ M___, naked from the waist down and sprawled on the floor of her residence. Some wounds on the body and much blood are visible in the photographs. We cannot determine from the record, however, whether the photos shown to the jury were color or black-and-white.

Once a defendant objects to photographic evidence on the basis of Rule 403, it is the task of the trial court to weigh the probative value of the photos against their potential for unfair prejudice. In accomplishing this task, it is necessary for the trial court to "consider the inherent tendency that [the] evidence may have to encourage resolution of material issues on an inappropriate [emotional] basis and [to] balance carefully against [that inherent tendency] the host of factors affecting probativeness, including [the] relative weight of the evidence and the degree to which its proponent might be disadvantaged without it." *Fuller v. State*, 829 S.W.2d 191, 206

(Tex.Cr.App.1992). In determining whether photographs will tend to encourage resolution of material issues on an improper emotional basis, the trial court should consider factors such as, but not limited to, the photos' "gruesomeness, their detail, their size [i.e., whether they have been enlarged], whether they are black and white or color, whether they are close-up, [and] whether the body is naked or clothed." *Long v. State*, 823 S.W.2d 259, 272 (Tex.Cr. App.1991). It is also relevant for the trial court to consider whether the body as photographed has been altered since the crime in some way (e.g., by autopsy) that might enhance its gruesomeness to the defendant's detriment. Finally, an appellate court reviewing the trial court's decision should reverse it only for an abuse of discretion, i.e., only when the trial court's decision was outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Cr.App.1990).

Plainly, State's exhibits 25 and 26 were probative and relevant to the prosecution's case at the guilt/innocence phase, because they helped prove that M___ M___ died in her residence as the result of a deliberate, vicious attack. Thus, the photographs tended to disprove the implication in appellant's written statement that M___ M___'s death was unplanned and the result of sudden passion.

Equally plain, however, is the fact that, in the context of all the State's evidence—which included much testimony regarding the crime scene—the probative value of the photographs was less than it otherwise would have been.

Nevertheless, we are not persuaded that, without question, the danger of unfair prejudice substantially outweighed the probative value of the photographs. The photographs "are not, in our estimation, so horrifying or appalling that a juror of normal sensitivity would necessarily encounter difficulty rationally deciding the critical issues of this case after viewing them." *Fuller*, 829 S.W.2d at 206. The photos are neither large nor especially detailed, and we will not assume that those shown to the jury were in color. Most significantly, the pho-

tographs, although gruesome, merely depict the gruesomeness of the crime scene as found by the police. Although a crime scene may be gruesome, "that fact alone will not [necessarily] render the probative value of [photographic] exhibits [of the crime scene] substantially outweighed by any prejudicial effect." *Long*, 823 S.W.2d at 273. Point of error ten is overruled.

■ Appellant argues in his eleventh point of error that the trial court erred in admitting certain testimony of State's witness Wayne Swindell given during the guilt/innocence phase of trial. Appellant contends that the testimony in question was inadmissible hearsay. The State responds that any error in the admission of Swindell's testimony was not preserved for appellate review because another prosecution witness, Sylvia Saenz, gave the same testimony without any objection from appellant. Our examination of the record reveals that the State's description of Swindell's and Saenz's testimony is correct.

It has long been the general rule in this state, in both civil and criminal cases, "that an error in admitting evidence may be … waived if the aggrieved party himself introduces evidence to the same effect, or permits [his] opponent to do so at another point in the trial without objection." S. Goode, O. Wellborn & M. Sharlot, *Guide to the Texas Rules of Evidence* § 103.1, at 10 (1988). Therefore, any error in the admission of Swindell's testimony was waived. *Mayes v. State*, 816 S.W.2d 79, 88 (Tex.Cr. App.1991). Point of error eleven is overruled.

■ In his twelfth point of error, appellant argues the trial court erred in admitting, at the guilt/innocence phase, evidence of his March 27, 1988, behavior at S___ M___'s residence. Appellant argues, as he did at trial, that the evidence was inadmissible under Texas Rule of Criminal Evidence 404(b) because the State failed to give him notice before trial of its intent to introduce such evidence during its case in chief.[12]

Rule 404(b) provides that, "upon timely request by the accused," the State must provide reasonable notice, before trial, of its intent to use evidence of uncharged misconduct in its case in chief. In his brief to this Court, however, appellant fails to point to any place in the record showing that he made such a timely request for notice. Consequently, any error was waived due to inadequate briefing. Tex. R.App.Proc. 74 and 210; *Harris v. State*, 827 S.W.2d at 958. Point twelve is overruled.

In his thirteenth point of error, appellant complains of the admission in evidence, at the guilt/innocence phase, of State's exhibit 226. State's exhibit 226 was an electronically-enhanced tape-recorded copy of a portion of State's exhibit 223A, which was a reel-to-reel tape recording of all "911" telephone calls received by the San Antonio police from 8:00 a.m., April 14, 1988, to 8:00 a.m., April 15, 1988. Exhibit 226 was a copy of that small portion of exhibit 223A that contained the "911" call from S___ M___ at 3:17 a.m., April 15, 1988. Appellant argues that exhibit 226 was inadmissible under Rule 1003 of the Texas Rules of Criminal Evidence[13] because there was no

---

**12.** Rule 404(b) provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case in chief such evidence other than that arising in the same transaction.

**13.** Rule 1003 provides:

A duplicate is admissible to the same extent as an original unless (1) a question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.
 Rule 1001(4) provides:
 A "duplicate" is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original.

showing that it was an accurate reproduction of the relevant portion of exhibit 223A and because other evidence at trial raised a question as to the authenticity of exhibit 223A.

The State contends, on the other hand, that the trial court did not abuse its discretion in admitting exhibit 226 because testimony from prosecution witnesses established both the authenticity of exhibit 223A and the fact that exhibit 226 was an accurate reproduction of the relevant portion of exhibit 223A.

▆ We address first appellant's contention that the evidence at trial raised a question as to the authenticity of exhibit 223A. Under Rule 1003, a duplicate (here, exhibit 226) is inadmissible if "a question is raised as to the authenticity of the original." That is, under Rule 1003 a duplicate is inadmissible if, on the evidence presented, reasonable jurors might differ as to whether the original is what it is claimed to be. See S. Goode, O. Wellborn, and M. Sharlot, *Guide to the Texas Rules of Evidence* § 1003.1 at 659 (1988).

▆ At trial, San Antonio Police Department communications technician Douglas MacFarlane testified that all "911" telephone calls received by the police department were tape-recorded on master reel-to-reel tapes, that he operated that tape recording system, and that State's exhibit 223A was a master recording of all "911" telephone calls received during the 24–hour period in question. Our examination of the record has revealed no other evidence that would cast doubt on MacFarlane's testimony. Thus, we can see no basis for appellant's claim that a question was raised as to the authenticity of exhibit 223A.

▆ We also fail to see any basis for appellant's claim that the State made no showing that exhibit 226 was an accurate reproduction of the relevant portion of exhibit 223A. MacFarlane testified that he marked the relevant portion of exhibit 223A with a piece of paper before it was sent to the Federal Bureau of Investigation in Washington, D.C., for enhancement. F.B.I. signal processing analyst Barbara Colus then testified that she electronically copied and enhanced the marked portion of exhibit 223A, that exhibit 226 was the enhanced copy in question, and that the enhancement removed only "a hiss" and did not alter any of the voices on the tape in any way. In short, the only evidence before the trial court demonstrated that exhibit 226 was an accurate reproduction of exhibit 223A, and that exhibit 223A was in fact what the State claimed it was. On this record, then, we cannot see that the trial court abused its discretion in admitting exhibit 226. See *Webb v. State*, 760 S.W.2d 263, 276 (Tex.Cr.App.1988). Point of error thirteen is overruled.

In his fourteenth point of error, appellant argues the trial court erred in overruling his motion to suppress the written statement he gave to police shortly after his warrantless arrest. Appellant contends the statement was "involuntary" and inadmissible because "there was absolutely no reason [why] an arrest warrant could not have been obtained prior to any questioning." Appellant fails to explain, however, even by implication, what provision of law, state or federal, was offended by the admission of the statement in evidence. Because "[s]uch a failure to ... set out the legal theory on which appellant rests his contention means nothing is presented for review," *Pierce v. State*, 777 S.W.2d 399, 418 (Tex.Cr.App.1989), we overrule point of error fourteen.

▆ In his eighth point of error, appellant argues that, as applied to him, Texas Penal Code § 19.03(a)(6)(A), the statutory provision under which he was convicted,[14] violates the Eighth Amendment[15] to the United States Constitution and Article I,

**14.** See footnote one, supra.

**15.** The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The ban on cruel and unusual pun-

ishments was made applicable to the states by the due process clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962).

§§ 13 and 19 of the Texas Constitution. Appellant argues:

> Why should, under ... section 19.-03(a)(6)(A), a defendant such as Leopoldo Narvaiz, acting under a passion or [in] anger, and while voluntarily intoxicated, receive the death penalty, when should only one person have been killed, then the death penalty would not have even been available? Instead of focusing upon the conduct of the defendant, and his state of mind, and instead of channeling the sentencer's discretion by clear and objective standards, it seems that [the] death [penalty] is dealt out to someone who is unlucky enough to have more than one victim.

Turning first to appellant's Texas constitutional claim, we conclude that we need not address it, because appellant has proffered no argument or authority as to the protection provided by the Texas Constitution *or* how that protection differs from that provided by the United States Constitution. *Morehead v. State,* 807 S.W.2d 577, 579, fn. 1 (Tex.Cr.App.1991); *McCambridge v. State,* 712 S.W.2d 499, 501–502, fn. 9 (Tex.Cr.App.1986); Tex.R.App.Proc. 74 and 210. We will not make appellant's argument for him.

Turning next to appellant's claim under the Eighth Amendment, we find dispositive the Supreme Court's recent decision in *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). In that case, the Supreme Court upheld, against an Eighth Amendment attack, a death sentence imposed under a Pennsylvania statute that mandated a death sentence for murder if "the jury unanimously finds at least one aggravating circumstance [of those enumerated in the statute] and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." The jury that convicted Blystone found, as an aggravating circumstance,[16] that he had committed the murder while in the course of committing a felony, to wit, a robbery. In affirming Blystone's sentence, the Supreme Court explained that the presence of the statutory aggravating circumstance—the robbery—adequately served the Eighth Amendment's requirement of channeling the jury's discretion in the assessment of punishment.

Under § 19.03(a)(6)(A), the aggravating circumstance making an "ordinary" murder a capital offense is the murder of a second person during the same criminal transaction. Contrary to appellant's assertion, this aggravating circumstance *does* adequately channel the jury's discretion, just as the aggravating circumstance in *Blystone* did. Any evidence at appellant's trial suggesting that his criminal behavior was due partly or wholly to intoxication or emotional disturbance did not diminish the effect of the aggravating circumstance in channeling the jury's discretion. Point of error eight is overruled.

In his ninth point of error, appellant contends that Article 37.071(f),[17] as applied to him, violated the Eighth Amendment and Article I, §§ 13 and 19 of the Texas Constitution. Appellant argues:

> [In accordance with Article 37.071(f), the trial] court charged the jury to consider the deliberateness of the defendant's conduct in causing the death of [E___ M___, Jr.] but not the conduct nor its deliberateness in the death of his former girlfriend, [S___ M___]. It is no wonder that a death sentence resulted in this case, because the same passions, emotions, and mitigating circumstances which could have explained the death of [S___ M___], even if not rising to the level of voluntary manslaughter, were not applicable to the death of [E___ M___, Jr.]

Turning first to appellant's Texas constitutional claim, we again decline to consider

---

**16.** In the context of capital sentencing, an aggravating circumstance is simply a factor that the sentencer must find before it can impose the death penalty. The presence of an aggravating circumstance serves the purpose of limiting the class of death-eligible defendants, thus minimizing the risk of random imposition of the death penalty.

**17.** See footnote two, supra.

it, because appellant has failed once more to proffer any argument or authority as to the protection provided by the Texas Constitution. *Morehead v. State*, 807 S.W.2d at 579, fn. 1; *McCambridge v. State*, 712 S.W.2d at 501–502, fn. 9; Tex.R.App.Proc. 74 and 210.

■ We also fail to see any violation of the Eighth Amendment. A person convicted and punished for capital murder under the statutory scheme created by § 19.-03(a)(6)(A) and Article 37.071(f) is, in plain effect, convicted and punished for the murder of the *first* person listed in the indictment—in this case E___ M___, Jr.— whether or not that person was the person who was murdered first in time. The interaction of these two statutes makes the legislative intent quite clear. Thus, as noted in our discussion of appellant's eighth point of error, under the statutory scheme the murder of the second person listed in the indictment is merely the aggravating circumstance that renders "capital" the murder of the person listed first. It is quite unnecessary, under the reasoning in *Blystone*, for an aggravating circumstance—in this case the murder of a second person—to consist of "deliberate" conduct, as the term "deliberate" is used in Article 37.071.[18] Consequently, the Eighth Amendment was not offended by the trial court's refusal to submit the first punishment issue to the jury with respect to appellant's murder of S___ M___. Point of error nine is overruled.

■ In point of error sixteen, appellant contends the trial court erred in refusing his requested charge to the jury on the lesser included offenses of "ordinary" murder and voluntary manslaughter[19] as to all four victims. The record reflects that the trial court charged the jury on murder and manslaughter only as to J___ M___. Appellant, citing *Cordova v. Lynaugh*, 838 F.2d 764 (5th Cir.1988), but citing no record evidence, argues that the Fourteenth Amendment's due process clause and the

Eighth Amendment require that the jury in a capital case be allowed to consider a lesser included noncapital offense if the jury could rationally acquit on the capital offense and convict on the noncapital offense. The State responds that, with respect to the victims other than J___ M___, the lesser included offenses of murder and manslaughter were simply not raised by the evidence.

We agree with the State. Our examination of the record reveals there was no evidence at trial from which the jury could rationally conclude appellant was guilty only of murder or voluntary manslaughter with respect to the victims other than J___ M___. See *Miniel v. State*, 831 S.W.2d 310, 318 (Tex.Cr.App.1992). Point of error sixteen is overruled.

Appellant argues in his seventeenth point of error that he was denied the effective assistance of counsel, as guaranteed by the Sixth Amendment. Appellant maintains his trial counsel was ineffective in failing to request a jury charge at the guilt/innocence phase instructing the jury that "sudden passion should be negated in the application paragraph for ... capital murder." See *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Cr.App.1983). Appellant complains further that "[t]he charge in this case never once in any portion suggests that sudden passion should be negated prior to returning a guilty verdict of capital murder."

■ The Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defence." This right, made applicable to all state felony prosecutions by the due process clause of the Fourteenth Amendment, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), is the right not merely to the assistance of counsel, but rather to the reasonably effective assistance of counsel. *Strickland v.*

---

18. Although the substantive crime of capital murder is complete with the commission of the second murder, whether or not it was done "deliberately," the jury can still consider any

*lack* of deliberation in the second murder in its consideration of the second punishment issue.

19. See footnote four, supra.

*Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To obtain a reversal for deprivation of this Sixth Amendment right, an appellant in a capital case must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland* at 688 and 694, 104 S.Ct. at 2065 and 2068; see *Craig v. State,* 825 S.W.2d 128, 129 (Tex.Cr.App.1992). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* 466 U.S. at 694, 104 S.Ct. at 2068.

■■■ Assuming *arguendo* the performance of appellant's trial counsel fell below a constitutionally acceptable level, we conclude nonetheless that appellant has failed to show there is a reasonable probability that, but for his trial counsel's errors, the result of the guilt/innocence phase of his trial would have been different. The only evidence at trial suggesting appellant might be guilty of voluntary manslaughter—appellant's written statement—related only to the killing of J____ M____; thus, if appellant was entitled to a *Cobarrubio* instruction on the negation of sudden passion, he was entitled to it only with respect to the killing of J____ M____. Since there was no evidence suggesting voluntary manslaughter with respect to appellant's other victims, and since the State's case with respect to all the victims was quite strong, we see no reasonable probability that the jury would have found appellant not guilty of capital murder even if they had been given a *Cobarrubio* instruction with respect to the killing of J____ M____. Point of error seventeen is overruled.

■■■ In his twentieth and last point of error, appellant argues his trial counsel rendered ineffective assistance, thereby depriving him of his Sixth Amendment right, by "failing to request a [jury] charge that would have allowed mitigating evidence to have been considered [at the punishment phase of trial], and [by] failing to introduce more mitigating evidence during the punishment phase." Appellant complains further that "if the jury believed that the conduct of any of the four deceased, or perhaps the voluntary intoxication [of appellant] on either drugs or alcohol, or perhaps [his] misplaced love for [S____ M____], or perhaps [his] comparatively good childhood [20] was a mitigating factor, there was absolutely no vehicle for them to express it in the verdict form." See *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Appellant does not explain what mitigating evidence his trial counsel should have proffered at the punishment phase.

We conclude appellant has failed to demonstrate that his counsel's performance fell below a constitutionally acceptable level. First, since appellant does not explain how the "mitigating" evidence he cites has relevance to his "moral culpability" beyond the scope of the punishment issues mandated by Article 37.071(b)—and it is certainly not apparent to us that this evidence does—we cannot see that his counsel rendered ineffective assistance in failing to request a nonstatutory punishment issue. See, e.g., *Goss v. State,* 826 S.W.2d 162, 166 (Tex.Cr. App.1992) ("mitigating" evidence of good character and intoxication at time of offense not relevant to moral culpability beyond scope of statutory punishment issues). Second, since appellant does not explain what mitigating evidence his trial counsel should have proffered, we cannot possibly find that a failure to proffer such evidence constituted ineffective assistance. Point of error twenty is overruled.

The judgment of the trial court is AFFIRMED.

CLINTON, J., dissents.

20. Appellant's mother testified at the punishment phase that she "never had any problems" with him as he was growing up.